[Cite as *In re B.G.*, 2023-Ohio-4628.]

STATE OF OHIO      )
                )ss:
COUNTY OF SUMMIT   )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: B.G.
     A.M.

C.A. Nos.    30764
              30765
              30766
              30767

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 21 02 000093
              DN 21 02 000092

DECISION AND JOURNAL ENTRY

Dated: December 20, 2023

SUTTON, Presiding Judge.

**{¶1}** Appellants, K.M. ("Mother") and D.G. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed two of their minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

**{¶2}** Mother and Father are the biological parents of B.G., born March 20, 2015; and A.M., born April 18, 2019. At the time this case began, these children were living with their unmarried parents. Mother and Father later married and had another child, who was also removed from their custody, but that child is not a party to these proceedings.

{¶3} On February 3, 2021, the police removed these children from a relative's home pursuant to Juv.R. 6. Father had left the children there without adequate clothing or supplies and the relative was unable to provide them with a home. The following day, CSB filed complaints to allege that both children were dependent because of concerns about neglect and possible physical abuse of the children, domestic violence between Mother and Father, the agency's inability to locate the parents or a relative who was able to care for them, and Mother's long-standing history of drug abuse, which had included the permanent removal of older children from her custody several years ago. Father also has an extensive criminal history, including multiple convictions of domestic violence, aggravated assault, felonious assault, and drug trafficking. After the children were removed from the parents' custody, concerns arose that they might also have been sexually abused in the parents' home.

{¶4} The juvenile court later adjudicated the children dependent and placed them in the temporary custody of CSB. In its dispositional order, the trial court also ordered that the parents would not have visitation with the children unless and until the children had been forensically evaluated and behavioral therapists recommended that visitation could occur. Neither parent objected to the adjudication or any aspect of the dispositional order.

{¶5} Shortly afterward, the children were evaluated for symptoms of sexual abuse at Akron Children's Hospital, but experts there were unable to substantiate sexual abuse. B.G. also obtained a forensic evaluation by a mental health expert over a period of several interview sessions. That expert was also unable to substantiate sexual abuse, but she concluded that B.G. had been exposed to ongoing trauma, which had included witnessing domestic violence between his parents. Although B.G. did not indicate that Father ever hit Mother, he had drawn a picture of his family, which included Father holding a gun. When the expert asked B.G. about the gun in the picture, he

told her that Father often pointed a gun at Mother and that he had once witnessed Father fire the gun into the air. B.G. also told her that Father often "whooped" him with objects such as a belt, cord, or a shoe. B.G. told her that he wished Father would stop "whooping" him and threatening Mother with the gun. The expert diagnosed B.G. with post-traumatic stress disorder ("PTSD") and recommended that he receive trauma-based therapy, which he received throughout this case. B.G. was initially placed in a therapeutic foster home with A.M. but was later removed because of his aggressive behavior toward others in the home. B.G. was then placed in a residential treatment facility for the remainder of this case.

{¶6} Shortly after the case plan was adopted, CSB assigned a new caseworker to this case because Father had repeatedly threatened to harm the prior caseworker. Although the case plan required Father to address his history of volatile behavior and concerns about domestic violence in the family home, Father never addressed that problem during this case. Instead, throughout this two-year case, he denied that he had any issues with anger management or domestic violence.

{¶7} When Father met with the expert who conducted the forensic evaluation of B.G., he denied that he had ever hit B.G. with any objects or that he had a gun in the home. In addition to B.G. reporting that Father often threatened Mother with a gun, Mother admitted that Father had kept a gun in the home. Moreover, at one point during this case, Mother was residing in a battered women's shelter.

{¶8} Father's denial about owning a gun was also contradicted by other, undisputed evidence in this case. One week after the children were removed from the home, a law enforcement officer found a firearm in Father's vehicle while questioning him about some crimes in the area. Father reported that he had the gun for his own protection because people were trying

to harm him after a drug deal gone bad. Father was convicted of federal charges of unlawful possession of a firearm by a felon, based on numerous prior felony convictions including felonious assault and drug trafficking. Father was sentenced to six months of incarceration and six months of home confinement. Father unsuccessfully moved the federal court to modify his sentence to replace the period of incarceration with a longer period of home confinement. Father's counsel was able to extend the commencement of incarceration, however, until after the final hearing in this case.

{¶9} Mother does not dispute that she made minimal progress toward reunification in this case. She did not achieve even a brief period of sobriety and, in fact, was convicted of multiple unrelated felony drug offenses during this case. Mother was initially placed on community control, but she repeatedly violated the conditions that she comply with drug treatment and maintain sobriety, so she was ultimately incarcerated. At the time Mother reported to begin her incarceration at a halfway house, she tested positive for cocaine.

{¶10} On January 27, 2023, CSB moved for permanent custody of both children. Following a hearing, the trial court terminated parental rights and placed A.M. and B.G. in the permanent custody of CSB. Mother and Father separately appealed and their appeals were later consolidated. Their assignments of error will be addressed together because they are closely related.

II.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED ERR[OR] AND ABUSED ITS DISCRETION IN GRANTING [CSB'S] MOTION FOR PERMANENT CUSTODY. MOTHER AND FATHER INTENDED TO CO-PARENT THE CHILDREN AND THE GRANT OF PERMANENT CUSTODY TO [CSB] WAS NOT IN THE BEST INTEREST OF THE MINOR CHILDREN OF THE PARTIES.

**FATHER'S ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT GRANTED PERMANENT CUSTODY TO [CSB] AS THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

**{¶11}** The parents argue that the trial court's permanent custody decision was not supported by the evidence presented at the permanent custody hearing. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶12}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.)

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶13} The trial court found that the first prong of the permanent custody test was satisfied because B.G. and A.M. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). The parents do not dispute that finding, which is supported by the record. The children were considered to have entered the temporary custody of CSB on April 4, 2021 (sixty days after they were removed from the home, which was earlier than the April 15 date they were adjudicated), and CSB filed its motion for permanent custody on January 27, 2023. *See* R.C. 2151.414(B)(1). Consequently, at the time CSB moved for permanent custody, the children had been in its temporary custody for more than 21 months of a consecutive 22-month period.

{¶14} On appeal, the parents challenge the trial court's finding that permanent custody was in the best interest of the children. Both parents argue that they complied with the reunification goals of the case plan. This Court has repeatedly held, however, that case plan compliance may be relevant to the children's best interest, but it is not dispositive. *In re K.C.*, 9th Dist. Summit Nos. 30234 and 30237, 2022-Ohio-2851, ¶ 17, citing *In re J.W.*, 9th Dist. Summit No. 28976, 2019-Ohio-210, ¶ 15. Furthermore, the evidence in the record demonstrates that Father did not make significant progress toward reunification. He complied with the substance abuse component of the case plan by engaging in medically-assisted drug treatment. He did not complete a psychological evaluation, however, nor did he participate in counseling to address his anger management and domestic violence history. He engaged in some counseling but admittedly did not disclose his history of domestic violence or anger management problems. Father was also terminated by one of the counseling agencies for noncompliance.

{¶15} This Court's best interest review focuses primarily on the best interest factors set forth in R.C. 2151.414(D). *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 25. In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[1] R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶16} For the first several months of this case, neither parent had any interaction with the children because the trial court had suspended their visitation. Eventually, the parents were permitted to have supervised visits with the children but few details about the visits were introduced at the hearing except that Father visited B.G. more consistently than Mother. Father's visits with B.G. were supervised by the child's therapist, who testified that their visits went well but that B.G. was not left unsupervised with Father and would not be prepared to begin counseling with Father anytime soon. He explained that B.G. would need more treatment at the residential facility and would later need to transition to a therapeutic foster home due to his serious behavioral problems.

{¶17} The wishes of the children were expressed by the guardian ad litem. Although the parents point to evidence that B.G. had expressed a desire to return home, the child expressed those wishes early in this case. By the time of the hearing and after extensive counseling two years later,

---

[1] CSB did not specifically allege, and the trial court did not find, that any of those provisions applied to the facts of this case.

although B.G. enjoyed seeing Father during visits, he had told the guardian ad litem that he wanted to return to the home of his former foster family, where A.M. was still residing. The foster family was receptive to B.G. returning there when he was ready to leave the residential facility.

{¶18} A.M. was too young to express her wishes. The guardian ad litem opined that permanent custody was in the best interest of both children because the parents had not remedied their parenting problems, and both had denied or minimized the serious mental health and behavioral problems of B.G. and their responsibility for exposing him to trauma. Father had explicitly minimized the child's behavioral problems by implying that he was simply acting as a rambunctious boy.

{¶19} The children's custodial history had included more than two years living in temporary placements. Prior to this case, they lived with their parents and were exposed to ongoing trauma in the home. They needed a legally safe and secure environment and CSB had been unable to find any appropriate relatives who were willing and able to provide a home for the children. The parents assert that Father was prepared to provide them with a permanent home, but Father had failed to remedy his parenting problems or even accept that B.G. had serious mental health and behavioral problems for which he bore some responsibility. Moreover, at the time of the final hearing, Mother was incarcerated, and Father was facing a six-month period of incarceration.

{¶20} Father asserted at the hearing that he was going to reapply for early release so that he could care for his children, but he presented no evidence that he had done so or that there was any likelihood that he would be able to avoid his upcoming incarceration. Father further asserted that he had friends who could help care for the children, but none of those friends had been evaluated by CSB. Father had been facing his federal gun charge and conviction throughout this two-year case but had made no appropriate plans for the care of his children. The trial court had

ample evidence before it to support its conclusion that a legally secure permanent placement would only be achieved by placing these children in the permanent custody of CSB.

{¶21} The parents have failed to demonstrate that the trial court lost its way by terminating parental rights and placing A.M. and B.G. in the permanent custody of CSB. *See Eastley* at ¶ 20. Their assignments of error are overruled.

### III.

The parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

STEVENSON, J.
FLAGG LANZINGER, J.
CONCUR.


APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

DAVID M. LOWRY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.